## AMERICAN SULPHITE PULP CO. v. HOWLAND FALLS PULP CO.

(Circuit Court, D. Maine. November 9, 1895.)

1. PATENTS—CONSTRUCTION OF CLAIMS.
   In a patent which claims the use of "cement" as a continuous lining for a wood pulp digester, without specifying the kind of cement, the word must be construed as covering only the ordinary commercial hydraulic cement, if a broader construction would give to the patentee the whole art when it is more than he can claim to have invented.

2. SAME.
   The Telephone Cases, 8 Sup. Ct. 778, 126 U. S. 1, 2, where the court made the patent practically as broad as the art, distinguished.

**3.** SAME—PATENTABLE INVENTION.

At the time of the alleged conception of the invention claimed under the Russell reissue, No. 11,282 (original, No. 445,235), the state of the art was such that there would be patentable invention in a practical and useful device of a continuous and homogeneous lining which could be applied in a plastic form to the interior of wood pulp digesters operated with the aid of acids, and none of the claimed anticipatory matter set up in this case was properly of that character.

**4.** SAME—INDEFINITE SPECIFICATIONS.

The fact that the specification is subject to some criticism on the ground that it is confused and misleading, or contains some incorrect statements of a historical character, is not sufficient to avoid the patent, if enough appears to enable those skilled in the art to accomplish all that is covered by the patent as construed by the court. Specifications will not be criticised closely, or subjected to technical rules, in such particulars. It is, ordinarily, sufficient that the purpose of the statute is substantially worked out, and that the specification is not intentionally misleading in essential matters.

**5.** SAME—REISSUES—EFFECT OF COMMISSIONER'S DECISION.

Where an application for a reissue alleged inadvertence with reference to particulars stated, *held* that, although the court was of opinion that the reissue was not essential, and did not change the construction or effect of the patent, yet the question whether the specifications needed amendment, and whether a reissue was essential or proper, was so much a matter of doubt, and therefore rested so largely with the commissioner of patents, that his decision granting the reissue could not properly be reviewed.

**6.** SAME—FAILURE TO DISCLOSE INVENTION—PLEADING.

An allegation in the answer, in the words of Rev. St. § 4920, that the specification of the patent sued on was made to contain less than the whole truth relative to the invention, and more than was necessary to produce the desired effect which the law assigns to specifications, is too general to require the attention of the court. The answer should point out specifically the details of the fraud or subterfuge relied on.

**7.** SAME—PRIOR USE IN FOREIGN COUNTRY.

Construing together the provisions of Rev. St. §§ 4886, 4887, 4892, 4920, the prior public use or sale which will defeat a patent procured by one domiciled in this country is limited to a use in the United States, and no foreign use could have that effect in such a case, whatever may be the law with reference to a use in the country where an alien patentee is domiciled.

**8.** SAME—ANTICIPATORY PUBLICATIONS.

A publication which describes an invention as consisting of an "acid-resisting protective material for lining sulphite digesters," without disclosing the substances of which the material is composed, cannot be considered an anticipatory publication. Seymour v. Osborne, 11 Wall. 516, and Eames v. Andrews, 7 Sup. Ct. 1073, 122 U. S. 40, followed.

**9.** SAME—PRIORITY OF INVENTION—BURDEN OF PROOF.

Where it appears that an invention used in a foreign country was made known to one claiming to be an independent inventor in this country, prior to the filing of the application upon which he obtained his patent, the burden is thrown back upon the patentee to establish prior invention by him by full, unequivocal, and convincing evidence.

**10.** SAME—INVENTION—COMPLETENESS OF CONCEPTION.

Where one, claiming to be an independent inventor in this country of a cement lining for pulp digesters, admittedly received information, before filing his application, of the use of the same invention in Europe, *held* that, in order to support his patent, it must appear that, before receiving such information, the mental act of invention was complete, including everything involved in the result, except the working out of mere details of construction, and that it would not be sufficient if his conception, at that

time, went no further than entertaining the idea of the desirability of some material having the requisite characteristics.

11. SAME—WOOD PULP DIGESTERS.

The Russell reissue, No. 11,282 (original, No. 445,235), for improvements in wood pulp digesters, consisting in lining the same with a coating of cement, *held* void for want of completed invention by the patentee prior to the receipt of a letter by him disclosing the use of such invention in Europe.

This was a bill by the American Sulphite Pulp Company against the Howland Falls Pulp Company for infringement of reissued patent No. 11,282 (original No. 445,235) for an improvement in wood pulp digesters.

Causten Browne and Alex. P. Browne, for complainant.

John L. S. Roberts and B. D. & H. M. Verrill, for respondent.

PUTNAM, Circuit Judge. This case involves a controversy over a patent issued to George F. Russell, growing out of an application filed April 10, 1890, and culminating in a reissue dated November 15, 1892. The patent relates to improvements in the construction of digesters in which wood pulp is manufactured by the sulphite process, and the claims are as follows:

"1. The improved pulp digester herein described, having an outer shell, A, and a continuous lining or coat, B, of cement, as described, applied to the interior of the said shell, for the purpose set forth.

"2. The improved pulp digester herein described, having an outer shell, A, a continuous lining or coat, B, of cement, substantially as described, applied to the interior of the said shell, and an interior lining of tiles, C, all substantially as set forth."

The second claim need receive no attention. It is distinguished from the first only by the addition of an interior lining of tiles. The specification states that the purpose of this lining is to prevent the wearing away of the cement by the friction of the mass of pulp. There is no invention in this, and the whole substance of the patent is in the first claim. This consists of only two elements, the shell and the continuous lining or coat of cement. Its language is so unequivocal that its construction needs no aid from secondary rules, and is not enlarged nor limited by the redundant, and, in some particulars, somewhat obscure, language of the specification, whether of the original patent or of the reissue, except in one particular.

In The Telephone Cases, 126 U. S. 1, 2, 8 Sup. Ct. 778, the court found that Bell discovered that human speech could be reproduced and understood over a telephone by gradually changing the intensity of a continuous electric current, that he had devised a way by which these changes of intensity could be made and speech actually transmitted, and that thus he put the art in condition for practical use. Consequently, the court held that the use of a continuous electric current was his art. Thus, the court made his patent practically as broad as the art, notwithstanding he had not discovered every way in which the art could be made useful. In the case at bar, the corresponding art would include every form of continuous, homogeneous, acid-resisting lining which can be applied in a plastic form; and the substantial difference is that, in the Telephone Cases, the idea of

making use of a continuous electric current for transmitting human speech was new, while the idea of a continuous, homogeneous, acid-resisting lining was a common one in the practical arts, but no method had been devised of constructing any form of it suitable for pulp digesters. Consequently, whatever invention was made in this field was limited to specific methods of working out the common idea, and of applying it usefully. To admit more than this in behalf of the patentee in this case would necessarily admit that he was entitled to cover the whole art, which is plainly impossible.[1] In harmony with this, the claim was limited to a coat or lining of cement. But this word has the ordinary, commercial meaning of hydraulic cement, and also a larger, and, perhaps, more accepted, sense. It cannot, in this patent, be given the latter, without substantially giving the patentee the whole art, and much more than he can claim to have actually invented or discovered. Therefore, we are compelled to limit the word which he has himself chosen to its ordinary, commercial sense. An examination of the file wrapper leads to the same results, but we need not enlarge on this. The word "cement" having various significations, its precise definition for this purpose must thus be determined. With that exception, we need only say that we are not to construe what does not need to be construed, and that the simple phraseology of this claim can neither be added to, nor taken from, by what appears in the specification, by what occurred in connection with the reissue, or by any alleged implied disclaimer arising in relation thereto. We know of no mystery relating to ascertaining the legal meaning of claims in patents, and we apply to this case the fundamental rules by which is read every instrument whose language is clear in itself.

The second element in the first claim is the "continuous lining or coat of cement, as described, applied to the interior" of the shell. If the words, "as described," had followed the word "applied," there would have been some basis for argument in favor of a narrow and merely verbal construction, which might have limited the claim to cement applied in the precise manner pointed out in the specification. But, as they stand, the words, "as described," can have no effect to restrict the claim in that manner, and it covers every kind of continuous lining or coat of cement, limiting the word "cement" as already stated. It thus includes a lining made up mainly of cement blocks, as practiced by the defendant. If the patentee, Russell, was entitled to his patent at all, the defendant's method of obtaining a continuous lining of cement is plainly within its scope; and it differs so unsubstantially from the method described in the patent that it has the appearance of a mere evasion, easily devised when sought for, and plainly within the rules touching equivalents.

Does the patent represent a patentable invention? In answering this question, we for the present assume that the work of the patentee, Russell, whatever it was, was original in the sense of the patent

---

[1] Note by the Court: The Incandescent Lamp Patent, 159 U. S. 465, 472, 473, 476, 16 Sup. Ct. 75, decided a few days after this opinion was passed down, seems to confirm these views.

law. It is very evident that the art to which the patent relates had
been for a long time urgent for a practical lining for the iron or steel
shells of digesters, which would be reasonably economical, and that
the urgency had been so great as to have become a fundamental ne-
cessity. For several years no one had been able to respond; so that,
under the circumstances, whoever should solve the whole problem,
or should make advances of practical use in that direction, whether
by adoption from other arts, or otherwise, would have been entitled
to be held an inventor, both by the common judgment and by the
courts. Mitscherlich accomplished this in part; but he always had
a lead lining in direct juxtaposition with the shell, and his interior
material was not continuous. The Russell device displaced the lead,
and furnished a continuous and homogeneous lining. That the use
of cement as a continuous lining, and the consequent dispensing with
lead linings, involved a true and valuable discovery, either by the
patentee in this suit, or by Wenzel, who will be referred to more par-
ticularly hereafter, or by each of them independently of the other,
is shown by indubitable earmarks appearing through the record, at
various points. The French patent of Pierredon, so much relied on
by defendant, shows this in the fact that Pierredon carefully pointed
his joints with lead, so as to prevent the possibility of the exposure
of even a thread of the cement to the acid contents of the digester.
The reception in Europe of the Wenzel digesters answers this
question; and even as late as July 30, 1889, which was a few
months after the time when the patentee in this case claims to have
completed his invention, Springer, an admitted expert regarding the
use of this class of digesters, and who had been investigating the
subject-matter abroad, doubted, in his letter of that date, the prac-
ticability of using cement, "as we understand the word," to put it as
he does.

Whether or not the device of the patentee in this case has demon-
strated to all pulp makers using this class of digesters, the superi-
ority claimed for it, or whether or not it will substantially supplant
other digesters which have preceded it in the United States, it is evi-
dent that, in the practical judgment of a large portion of those who
manufacture pulp with the aid of acid, it accomplishes what the art
has been looking for. The court agrees with this judgment, and we
hold that, under the circumstances, the device presents invention
in the sense of the law, and of a very useful character. This con-
clusion comes so clearly as the result of the settled rules which guide
the judgment in determining what is patentable invention, that we
need not enlarge upon them, beyond referring to those laid down in
C. & A. Potts & Co. v. Creagher, 155 U. S. 597, 606, 15 Sup. Ct. 194,
and Watson v. Stevens, 2 C. C. A. 500, 51 Fed. 757, 761. The decisions
are now so numerous, falling on one side or the other, that it seems
useless to cite them at length; but the study of them from time to
time, and the consequent apprehension of the way in which alleged
inventions impress the practical judgments of those whose constant
duty it is to determine questions of the character involved, bring us
easily to this result. As bearing thereon, it is of no consequence
whether Mitscherlich regarded his interior lining of cemented brick-

work as his substantial element, or the lead lining as such, or whether it now appears that his lead lining might have been dispensed with in his digesters; because it is plain that never, until after Russell's or Wenzel's construction became known, had the simplicity of their method occurred to any one. Pierredon's "Pierre de Volvic,"—quarried blocks of lava,—set in cement, with the cement carefully pointed with lead, in no way foreshadowed it. On the whole, we think that we need only apply well-known guides to a class of facts very common, to direct our apprehension, and to enable us to determine that all the foregoing parts of the case are with the complainant.

We do not deem it necessary to discuss at length such alleged anticipations as that of Sharpless, relating to tubs, tanks, vats, and other like open vessels in common use, or to any structures in which there do not exist the conditions necessarily present in digesters of the class at bar with reference to the use of acid under high pressure and temperature. It is plain that such alleged anticipations not only failed to suggest to those skilled in the art the use of cement for digesters, but that those skilled believed they could not be adapted for the purposes now under discussion, as is shown by the proofs already referred to. The conditions are so different that the uses are not analogous.

Some criticism is made of the specification found in the patent in suit, and of the circumstances of the reissue, to the effect that the specification is confused, and is also misleading, and that the reissue was obtained by subterfuge. In the view we take of the purview of the patent, the specification is undoubtedly subject to some criticism on the ground of indefiniteness; and yet enough remains to enable those skilled in the art to accomplish all which is covered by the patent as we construe it. It is said the specification contains some statements of a historical character which are not correct; but, while these may be of some use on other points, they are not of a character which could mislead either the patent office or the public, and they appear more to indicate uncertainty than an intention to deceive. It is not the custom of the courts to criticise specifications, in these or like particulars, closely, or to subject them to the tests of technical rules. It is, ordinarily, sufficient that the purpose of the statute touching them is substantially worked out, and that they are not intentionally misleading in essential matters. While, according to our opinion, the reissue was not necessary, and the construction and effect of the patent are in all respects the same as though it had not been obtained, yet the application for it claimed inadvertence with regard to the description of the compactness of the material used for lining, and to the directions with reference to its thickness; so we think that, on the whole, the determination whether the specification needed amendment, and whether a reissue was essential or proper, was so much a matter of doubt, and, therefore, rested so largely with the commissioner of patents, that it cannot be properly reviewed by us.

We may say, once for all, touching all the suggestions of subterfuge or fraud, that, while the answer alleges, in the language of section 4920 of the Revised Statutes, that the specification was made

to contain less than the whole truth relative to the invention, and more than was necessary to produce the desired effect which the law assigns to specifications, yet the allegation is too general to require the attention of the court. This is the only allegation of this character found in the bill, and, according to the well-known rules of equity pleading, when it is intended to set up fraud or subterfuge, the allegations must point out specifically the details thereof, so that the mind of the court can be drawn particularly thereto, without being compelled to wander at large through a great mass of proofs extending over a voluminous record. We think we are not called on to consider further any defenses of the character we are now referring to.

As it must be admitted that the device was in use in Europe before the patentee in this case claims to have first conceived the idea of the elements of his alleged invention, the proposition is made by the defendant, although not strenuously urged, that that part of section 4886 of the Revised Statutes which relates to prior public use or sale is not limited to public use or sale in the United States. The phraseology of the various sections of the Revised Statutes touching prior use or sale is not harmonious. In the early part of section 4886 appear the words, "not known or used by others in this country." Then come the words, "and not in public use or on sale for more than two years prior to his application," without any expressed territorial limitation. Section 4887 provides that no person shall be barred from receiving a patent by reason of its having been first patented, or caused to be patented, in a foreign country, "unless the same has been introduced into public use in the United States for more than two years prior to the application." This relates to a foreign patent taken by one who is also a patentee under our own laws. Section 4892 provides that the applicant shall make oath that he does not know, and does not believe, that the device "was ever before known or used," and here without any express territorial limitation. Section 4920, specifying the special matters in defense of which notice is to be given to the plaintiff, sets out as the fifth, "that it had been in public use or on sale in this country for more than two years before his application for a patent." Putting these provisions together, and combining with them the fact that section 4886, where it refers to prior patents and printed publications, expressly includes foreign countries, we cannot, in this case, entertain the defendant's proposition as to any foreign use of any nature, whatever the law may be with reference to use in the country where an alien patentee is domiciled. We believe the universal understanding of the courts on this proposition is the same as ours.

The difficult questions in the case arise from the claim of the defendant that the patentee, Russell, was not an inventor at all. It is also claimed that there was a prior description in certain printed publications in Europe. We do not think the claim last stated involves any difficulty, independently of the other, and it will be, disposed of incidentally while discussing it.

There is now no doubt that the invention of Wenzel, to which we have already referred, covered the device in question, and was

made sufficiently known to the patentee before he filed his first application in April, 1890, as we will show more fully hereafter. We refer to this fact now only in a general way, as relating to the burden and character of proof required. In Andrews v. Hovey, 124 U. S. 694, 716, 8 Sup. Ct. 676, the supreme court said:

"Patents are often granted with a view to leaving open, to be decided by the courts, questions which the patent office does not deem it proper to adjudicate against the applicant by withholding the patent."

If there is anything of practical value left of this statement, it must be considered as trimmed down to extreme narrowness by the extension in Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, of the rule announced in Cantrell v. Wallick, 117 U. S. 689, 695, 6 Sup. Ct. 970, that not only does the burden of proof rest on the party who sets up the defense of prior use, but that "every reasonable doubt should be resolved against him." However, we think that there are other decisions of that court which relieve us from discussing the application to this case of the rule of proof thus stated. Wenzel's invention was admittedly made known, not wholly, but sufficiently, to the patentee before his application was filed. Under these circumstances, the burden seems to be thrown on the complainant to establish prior invention by "full, unequivocal, and convincing" evidence. Manufacturing Co. v. Sprague, 123 U. S. 249, 264, 8 Sup. Ct. 122. This was, the practical rule applied in Thayer v. Hart, 20 Fed. 693, 22 Blatchf. 229. The ease with which interested ingenuity dresses up matters occurring after the fact renders it necessary that this strict rule be applied, both to the defense of anticipation, and to the rebuttal in behalf of a patentee. under the circumstances of this case, where substantial information was communicated to him between the alleged time of invention and the time of filing his application.

The complainant claims that the patentee perfected his invention, for all the purposes of the patent laws, as early as January, 1889. Before investigating this, it is necessary to establish certain facts and dates touching the Wenzel improvement to which we have already incidentally referred. Wilhelm Wenzel, of Vienna, Austria, obtained an Austro-Hungarian patent for a certain "acid-resisting protective material," applied for November 18, 1887, and granted May 27, 1888. This expired May 27, 1890, and, during its existence, it was a secret patent, so called; that is, its contents were not accessible to the public and did not become known until after its expiration. The application describes the invention as follows:

"A process for making an 'acid-resisting protective material,' in the cold, from firebrick powder, magnesite, hydraulic lime, water glass, and sodium chloride, in combination with a metal insertion, metallic or iron wire lattice work, and the special application of this process for covering or lining vessels, cellulose digesters, tanks, piping, or vessels having any kind of a name, consisting of the most various materials, for protection against exterior influences, against the action of acids or corrosive fluids."

That portion which corresponds to the specification in a patent from the United States contains, by implication, a statement that

the material was not hydraulic cement mortar, which is the substance of that in immediate dispute at bar, in the following language:

"As the protective mass is very much denser than Portland cement mortar, and is also acid resisting, it is evident that the metallic insertions, iron rods, can never oxidize, as they are completely hermetically shut off against all exterior influences, acids, all corrosive liquids," etc.

It also describes the process of making the material, and the method of applying it, as follows:

"The actual process of making the 'acid-resisting protective material' consists in mixing firebrick powder with burnt magnesite and hydraulic lime, or firebrick powder with the one or the other of both materials alone, in equal or unequal percentages. The materials mixed in this way are now well mixed with soda water glass, or soda and potash water glass, concentrated or diluted with water, in equal or unequal percentages, or also with the addition of sodium chloride, or, finally, with sodium chloride dissolved in water. Then the material is applied to the article to be produced, the lining, either by pouring into molds or with the trowel or spatula. Vertical or overhanging surfaces are fitted on one or both sides with sheet iron, or oiled or wetted boards; that is to say, are provided with a [core] mold into which the material described is poured, or, if the mold is only applied on one side, then the material is poured in, in small quantities, or else applied with a trowel or spatula. Instead of firebrick, powder sand may be used, or gravel, or sharp river sand, coarse sand," etc.

It closes with two claims, the second of which is for the process of applying the material. The first is in the following language:

"A process for making objects of all kinds, by pouring around a metallic insertion (specially iron rods), which is formed to correspond with the walls of the object, an acid-resisting protective material, consisting of firebrick powder, burnt magnesite, hydraulic lime, water glass, and sodium chloride, in the manner described."

Wenzel also obtained a Swedish patent, granted August 15, 1889, to take effect from November 13, 1888. This was not published until November 9, 1889. It differs somewhat in its specification from the Austro-Hungarian patent; but, nevertheless, it is like it, in that it nowhere describes a material so simple as mere hydraulic cement.

We do not understand that, under the circumstances, either of these patents is relied on as anticipatory matter of defense under the statutes of the United States. Wenzel issued certain trade circulars which anticipated in time the alleged invention of the patentee in this case. These need no notice from us, even if such circulars can ever be anticipatory under the patent laws, because they carefully concealed the nature of the invention. July 29, 1888, the Papier Zeitung, a newspaper circulating with the trade in Europe, published at Berlin, Prussia, contained an article touching Wenzel's material, with some testimonials relating to it. It described it as his "acid-resisting protective material for lining sulphite digesters." It, however, carefully abstained from stating of what substances the material was composed, and in this respect it, as well as the trade circulars, failed to meet the requirements of anticipatory publications, as given in Seymour v. Osborne, 11 Wall. 516, 555, and reaffirmed in Eames v. Andrews, 122 U. S. 40, 66, 7 Sup. Ct. 1073, and in other cases. The record shows that, prior to the important dates in the case at bar, Wenzel always manufactured

and applied his patented material at his own factory, and carefully protected his secret from the public in every way. But the matter goes somewhat further. Not only were Wenzel's proceedings concealed from the public, but they were in some degree deceptive. Ultimately, it was discovered that Wenzel was using the common combination of hydraulic cement and sand, although, as we have already shown, his Austro-Hungarian patent makes a show of disclaiming it. To hold, therefore, that an honest and innocent inventor could be deprived of the reward otherwise justly due him by such facts as are proven in connection with Wenzel's process, would push the doctrine of anticipation beyond all reason.

It is, however, claimed by the defendant that one Rademacher acquired, in Europe, full knowledge of Wenzel's process, and came to the United States in May, 1889, possessing this knowledge. It does not appear that he made it public, and, under those circumstances, it should, perhaps, be held that this could not constitute anticipation within the meaning of the statutes. However, we do not find it necessary to pass on this proposition, because the invention in litigation was complete before that time, if ever.

July 30, 1889, Mr. Springer wrote Mr. William A. Russell, of Lawrence, a letter from Cologne on the topic of digesters, in which the following appears:

"I have found a cement lining which, if it turns out to be what it now appears, is the best thing yet. It is simply a cement, and is put on as one would plaster a wall, is easily repaired and renewed. It is made by a firm of first-class cement makers some 300 miles from here, and I propose to see these people next week and arrange to have all of this cement we may need. * * * It seems impossible that this can be a cement, as we understand the word, since all cement has lime in it, and this, of course, would be attacked by the liquor. However, I shall know, before I return, the whole story."

George F. Russell, the patentee, testifies, as to this letter, as follows:

"Int. When did you first learn from any source that cement had been employed as a lining for a pulp digester, using the bisulphite process, by any one other than yourself, and how did you learn it? Ans. As near as I can recollect, the first information that ever reached me came to me in consequence of a letter received by Mr. William A. Russell from Mr. Charles Springer, and this was, to the best of my recollection, in the early part of August, 1889. I cannot remember the time, without referring to the letter mentioned. This letter conveyed the information that Mr. Springer had heard of a cement lining used for the bisulphite process, and was going to visit the mill where the lining was said to be in operation."

It cannot be claimed, and indeed is not, that, if the invention in litigation had not been completed by Russell, in the sense of the law, before this, its subsequent development would have been of any avail to him. Inasmuch as the letter contained the suggestion of cement, this result would have followed, even though the information it conveyed had been erroneous or disbelieved.

The applications filed in the patent office by the patentee, Russell, furnish unmistakable proof of the then condition of development of his conception, which it is claimed had ripened into invention nearly a year before the first application, filed, as already said, in April, 1890. It was amended, but a substituted specification was

filed October 17, 1890, which was also replaced by a second substitute, filed November 11, 1890. On the last the original patent was issued, which, in our view, was substantially the same as the reissue, so that the reissue need not be noticed by us in this connection. Pending these proceedings, other proceedings of a practical nature were taking place. Springer's letter of July 30, 1889, to which we have already referred, stated that the lining explained in it, which was Wenzel's, was "simply a cement," and "put on as one would plaster a wall." That the letter meant hydraulic cement is plain, because the very doubt which we have already cited from it refers to the fact that "all cement has lime in it." Springer afterwards, before he returned from Europe, satisfied himself that the material was Portland cement, and within a few days, probably within a week, after his arrival at New York on September 22, 1889, communicated this to William A. Russell. Not long after his return home, Springer visited Lawrence, and then discussed with one Libbey, in the presence of George F. Russell, what he had ascertained. Thus, it is plain that, at the time the patentee filed his first application, he shared whatever knowledge Springer had, but he probably retained some portion of Springer's original doubts. The question whether Wenzel had been guilty of artifice in misrepresenting the composition of his material, which Springer's information would raise, would naturally remain. It was probably in consequence of this that, in October, 1889, the digester known as "Boiler No. 5," at the mill of the Russell Paper Company, was lined, under the supervision, and perhaps direction, of the patentee, with Portland cement, silicate of soda, asbestos, and sand, instead of Portland cement alone. Other boilers in the same mill were lined, between February and April, 1890, with only sand and cement. This last work was, of course, in an experimental stage when the patentee's application, filed in April, 1890, was being prepared. Although apparently, at that time, all doubts might have been solved, yet they ran into his patent office file in a very significant manner. He commenced the substance of his specification of April, 1890, by saying:

"I take a suitable quantity of sand, preferably clean, sharp, building sand. Such sand is believed to have the capacity of resisting the action of any acid likely to be employed in the process of treating wood. * * * In order to make with this sand a lining material which can be readily applied to the interior of the boiler shell, and which, when applied, will adhere, and be durable under heat and pressure, a suitable binder must be used. Any substance may be employed for this purpose which is, or may be made, adhesive, both to the sand and to the boiler shell, and which will be durable under the variation of temperature and pressure to which it will be subjected in use. * * * The foregoing qualities would be found in a binder to be made plastic by heat, as for example, a mixture of tar, pitch, and clay."

The pith of this was sand. Whatever else there might be, it was used only to support the sand, and hold it in a firm mass. He then gave hydraulic cement a very uncertain position. What he said as to it in his specification was as follows:

"I have found, however, that, in practice, a very good binding material is obtained by using a hydraulic cement, preferably the best quality of Portland, made plastic by the addition of a suitable liquid,—for example, pure

water,—and mixed with the sand in quantity sufficient to form a strongly adhesive and cohesive mixture. Experiment has shown that a cement, such as Portland, has the capacity, when exposed to the action of the boiling acid, of becoming coated upon its exposed surface with a substance which is in itself practically acid-resisting. Such a cement, however, if used by itself as a lining, would, according to my experience, lack sufficient cohesive strength, and as the sand is in itself acid-resisting, it will be seen that each of the two ingredients contributes to the qualities desired in a lining for the purpose described."

None of the claims made cement a substantial element. We cite as illustrations the following:

"1. A pulp digester, consisting of an outer shell of iron or other metal corrosible by acid, and a lining composed of sand and a suitable binding material, as set forth.
"2. A pulp digester, consisting of an outer shell of iron or other metal corrosible by acid, and a lining composed of sand, and a binder formed of cement and a suitable liquid, substantially as and for the purpose set forth."

The substituted specification of October, 1890, presented in this respect a marked contrast to that of April. For the first time it covered all "adhesive acid-resisting material, applied when plastic," but it neither specified nor claimed any element whatever except hydraulic cement. The specification contained the following:

"I have found by experiment that an acid-resisting lining, of the character described, may be made from hydraulic cement, preferably the best quality of Portland, made plastic by the addition of a suitable liquid, as, for example, water. My experiments have shown that such cement, when applied, as above described, to the interior of a digester, and allowed to set thereon, forms a lining which is practically acid-resisting, and that a digester so lined may be run continuously, and through a large number of cookings, without any injurious effect of the acid solution upon the shell of the vessel."

He made at this time three claims, two covering generally adhesive acid-resisting material, applied when plastic, and one hydraulic cement, the last as follows:

"A pulp digester, having a lining of hydraulic cement, applied while plastic, and in a continuous coat, as set forth."

We might profitably notice the intervening amendments, but it is not necessary to do so. The final form which we have is in the two claims which we at the outset quoted, and in a specification which employs language apt to introduce a claim for every composition of plastic material, but which refers to hydraulic cement as follows:

"A convenient material for the purpose is commercial cement, preferably Portland, made plastic with water, and applied with any suitable implement upon the interior of the digester shell, so as to form a continuous covering therefor. Other cement-like materials or mixtures, having similar properties or characteristics, may be used, such as the ordinary cement mixtures, sand, and Portland cement, sand and tar, and the like."

We need not contrast these various expressions line by line. Their incompatibilities are glaring, and seem to leave it quite impossible to credit that the patentee's mind had grasped more than a year earlier such a clear and concrete conception as amounted to invention. To our mind the other proofs must be very convincing to overcome this difficulty, or they must fully explain it. The latter has not been attempted.

There are a great many expressions of the supreme court, used in applying the proofs to the law, in determining what degree of development of thought or experiment constitutes invention. Reference may be had to Agawam Co. v. Jordan, 7 Wall. 583, 606; The Corn Planter Patent, 23 Wall. 204, 210, 211; The Wood Paper Patent, Id. 566, 595; Plow Works v. Starling, 140 U. S. 184, 198, 11 Sup. Ct. 803; and The Barbed Wire Patent, 143 U. S. 275, 285, 12 Sup. Ct. 443, 450. The general rule deduced was expressed very effectively by Judge Grier, in Goodyear v. Day, 2 Wall. Jr. 283, 299, Fed. Cas. No. 5,569, as follows:

"It is usually the case, when any valuable discovery is made, or any new machine of great utility has been invented, that the attention of the public has been turned to that subject previously, and that many persons have been making researches and experiments. Philosophers and mechanicians may have, in some measure, anticipated, in their speculation, the possibility or probability of such discovery or invention. Many experiments may have been unsuccessfully tried, coming very near, yet falling short of, the desired result. They have produced nothing beneficial. The invention, when perfected, may truly be said to be the culminating point of many experiments, not only by the inventor, but by many others. He may have profited indirectly by the unsuccessful experiments and failures of others, but it gives them no right to claim a share of the honor or the profit of the successful inventor. It is when speculation has been reduced to practice, when experiment has resulted in discovery, and when that discovery has been perfected by patient and continued experiments,—when some new compound, art, manufacture, or machine, has been thus produced, which is useful to the public,—that the party making it becomes a public benefactor, and entitled to a patent."

The expressions in this class of cases differ, and their application to the states of facts differs more, according to the varying relations of the parties concerned to the question of priority, and the consequent difference of rules as to the amount of proof required and the presumptions to be overcome. We need not, however, examine them in detail, because they relate mainly, if not wholly, to issues between rival inventors, or other like issues, raising the question of priority in putting the invention into some concrete or visible form. Agawam Co. v. Jordan, ubi supra, at page 602. Moreover, in the case at bar, where the substantial question is whether Russell invented at all, we do not deem it necessary that the complainant should prove that the alleged invention was put into a practical, concrete, or visible form before the patentee received the information contained in Springer's letter. Yet he must have had, before that time, a clear and positive conception of the substance of what was afterwards patented; and this is true, whether that conception was the result of mere thought and introspection, or of speculation followed by tests, or was purely empirical and the mere sequence of experiments. The matter is well put in Rob. Pat. § 373 et seq.:

"The inventive act begins with the conception of the idea of means. It ends with the embodiment of that idea in a practically operative art or instrument." "The conception of the invention consists in the complete performance of the mental part of the inventive act." "By it, inventive genius, so far as it relates to this particular invention, is exhausted. All that remains to be accomplished, in order to perfect the art or instrument, belongs to the department of construction, not creation."

This author develops more fully the elements of the inventive conception in section 377, but we need not follow it further. His analysis of the inventive act is well recognized in Pickering v. McCullough, 104 U. S. 310, 319, as follows:

"It is objected, however, that the machines described in these patents are mere paper machines, not capable of successful practical working. But, on examination, it sufficiently appears, we think, that the objections can be sustained only as to minor matters of detail in construction, not affecting the substance of the invention claimed, and could be removed by mere mechanical skill, without the exercise of the faculty of invention."

Indeed, this whole subject-matter was well and pithily put by the complainant, to the effect that, when Springer's letter arrived in this country, Russell had conceived the invention, and was engaged in putting it into practice. Therefore, in the case at bar, the conception, or everything involved in the result except the working out of those details which belong to mere construction, must have preceded the knowledge of Springer's letter. If the mental act of invention was not then complete, its completion subsequently could not have constituted originality, and no claim otherwise is set up in the case. Russell's conception, in order to have been of value, should, as already explained, have covered some practical method of the application of the art of lining digesters with a homogeneous, continuous material, capable of being applied in a plastic form; and it would not have been sufficient that it was a mere suggestion of the whole art, without grasping some practical method of using it. Otherwise, the patent would clearly be defeated by the application, to what we have already explained, of the rules of Collar Co. v. Van Dusen, 23 Wall. 530, 562-564. In that case a manufacturer of collars had learned from his experiments that he wanted paper of certain qualities, and he so informed the paper manufacturer, but he did not communicate any information respecting the process by which such paper could be produced. It was claimed that the collar manufacturer was the first person to conceive the idea that paper possessing the prescribed qualities was desirable, and that he had the right to employ trained skill to produce the desired product, and should be regarded as the actual inventor under the circumstances which we have stated. The court held that he was not entitled to a patent covering either the paper or the process of producing it, as he never made any invention or discovery. So, in the case at bar, if the conception of the patentee did not go beyond the fact that he entertained the idea of the desirability of some material with the characteristics we have described, he could not, under the rule of the case cited, and under those explained by us, be regarded as an inventor. We have already expressed this quite fully in stating our conclusion that a patent could not be sustained which sought to cover the art as a whole. It follows, moreover, that the conception, to have been available, must have had a clear apprehension, not only of some material, or combination of materials, useful to accomplish the result desired, but of substantially the same used by the defendant. For the purpose of determining this proposition, we will con-

sider the history of the invention substantially as given by the complainant.

After apprehending the idea of lining a digester with a continuous or homogeneous material, Russell began to make small briquettes of various compositions, which he fastened inside a digester, to see what effect the bisulphite liquor, under the heat and pressure, would have on them. He testifies:

"One of the greatest difficulties which I, at that time, believed would have to be overcome was the expansion of the boiler shell, which I knew to be greater than ordinary tile or brick. I, therefore, as I mixed up the different compositions, applied a portion of the mixture to pieces of iron, and then heated both the iron and cement under a gas flame, to ascertain whether, upon heating up, the adhesion between the iron and the composition would be broken. To my great surprise, I found that many of these compositions adhered firmly to the iron after considerable heat had been applied."

He next lined a little retort, and cooked pulp in it by the sulphite process, and found that the composition kept its place, and protected the iron of the shell against the acid. This was in November and December, 1888. He says:

"All of the conditions used in the practice of making pulp by the bisulphite process were substantially the same in the small retort experiments."

By the late spring of 1889 he had had a number of small retorts made, of varying sizes, ranging up to 10 inches' diameter. In his various pipe retorts he tried many experiments as to the behavior of various compositions under sulphite conditions. Some of the linings tried did not stand the test, but, generally speaking, to use his words, "the mixtures of cement did stand the test," and he "was satisfied that linings could be made of such compositions." He made a cement mixture of tar and sand, i. e. bituminous concrete, and he says he found that it protected the iron, so far as he could judge, as well as the other compositions. In May, 1889, by direction of his employers, he tried a coating known as the "Kellner Wash" on a boiler known in the mill as the "Wilder Boiler," proximately 6 feet in diameter and 18 or 20 feet long. The boiler was an old one, and had been some time out of use, and was covered with rust on the inside. The ends of this boiler were made of heavy cast iron, ribbed on the inside for strength. These ribs formed pockets or recesses, where the scale was hard to remove. Russell says:

"Mr. Rutter reported to me that he could not remove this scale without consuming a large amount of time. As we were very anxious to perform the experiment at once, we decided to line the ends of this boiler with cement, and it was done. As the recesses were quite deep, we employed, to fill in, the larger part of the depth, with brickwork laid in cement, covering this over with a coating several inches thick. We then, having cleaned the rest of the shell, proceeded to put on the Kellner wash referred to, with the result that it came off as soon as the bisulphite liquor was cooked in it. We persisted in this experiment for some time, with no gratifying results as to the Kellner coating."

The cement employed was a mixture of Roman cement and sand, what is known commercially as "Roman Cement," and the proportions about two parts of Roman cement to one of sand. He explains what he means by "brickwork laid in cement" thus:

"When we came to filling up the recesses referred to, we found that it was going to take a large quantity of cement to fill the inner recesses, and we decided to use pieces of brick to fill up part of the space. These pieces of brick we used under the cement, merely to save cement."

He thus states the result of the experiment, as regards the cement linings upon the ends of the boiler:

"The cement in the ends of the boiler remained intact, and did not appear to be affected materially by the action of the bisulphite liquor, confirming strongly the results of previous experiments I had made with small briquettes and small retorts."

The complainant admits that nothing more was done by Russell until October, 1889, when rotary No. 5 was lined throughout, as we have already stated. We ought to explain that the patentee, Russell, states that he used the terms "cement" and "composition" to mean the same thing. Therefore, the word "cement," in the historical statement made by the complainant, which we have substantially given, fails to convey any precise idea. Only at one point do the proofs give the precise composition used, and that is in the following extract from Russell's evidence:

"Int. Please read to the examiner, to be taken down, the earliest entry which you find relating to the making of pulp in connection with the experiments we are now considering. Ans. This is a diary for 1888. I find, under Friday, November 2, the following entry. 'Rigged up pipe retort in laboratory.' And, on Monday, November 26, 'Made some fair pulp in retort. 28 1S 1Cr.'"

Therefore, not only does the record fail to show, with the positiveness which the rules of evidence stated by us require, that the patentee used the composition in issue here,—that is to say, a composition consisting mainly, if not wholly, of hydraulic cement,—but it fails to give even sufficient evidence from which the court could draw an inference in his favor in that particular. With the exception of the experiment of November 26, 1888, referred to in the foregoing quotation, and what is said about the Wilder boiler, there is an entire lack of evidence on this point. The patentee explains that the composition used in the experiment of November 26th consisted of two parts of sand, one part of silicate of soda, and one part only of Roman cement. The evidence does not explain the nature of silicate of soda, or its supposed usefulness in the composition referred to. It is understood by the court to be of the nature of liquid glass, and therefore a most significant element, not only with reference to binding the composition together, but, more especially, with reference to resisting the action of acids. So far as the court can discover, it may have been regarded by Russell as the most important element for these uses contained in the combination of November 26th. The future history of the case gives great significance to this element of silicate of soda. It appears that one Orrman was employed by a member of the syndicate now composing the American Sulphite Company, the complainant in this case. August 18, 1889, Orrman wrote one Selin in Finland seeking information touching Wenzel's composition, inquiring, especially, of what the lining consisted and with what thickness it was applied. The reply was dated September 5th, and stated Selin's general ignorance of the composition, but affirmed positively that there was silicate of soda

in it. Immediately on receipt of this, Orrman commenced experimenting with bricks of Portland cement, sand, and silicate of soda, in various proportions, being the precise elements used in the experiment of November 26, 1888. Subsequently, on account of the difficulties which the Russell Paper Company experienced with its digesters, it fitted up, as already stated, the boiler No. 5 in October, 1889, under the superintendence of the patentee, who testifies that he used for this purpose, as already said, a composition of Portland cement, silicate of soda, asbestos, and sand. But later, beginning in the spring of 1890, the remaining boilers of the Russell Paper Company were lined, mainly or wholly, with the material in issue in this case, namely, hydraulic cement. The history of the case, and especially the application, specification, and claim filed by the patentee in April, 1890, which we have fully explained, not only fail to furnish proof that Russell conceived the use of hydraulic cement, as in issue in this case, but, on the other hand, the experiment of November 26, 1888, and the other facts to which we have referred, prove affirmatively that he regarded silicate of soda, or some other peculiar material, an essential part of the composition.

The application of hydraulic cement and sand in filling the spaces at the ends of the Wilder boiler had in view no result in issue here. It was a mere makeshift for other purposes. The long interval which elapsed between this application and the next application of hydraulic cement and sand, which was in the spring of 1890, shows that it had no special purpose in view. The conditions were essentially unlike those of the proper and usual application of a cement lining to the entire shell of a digester. So that we must hold it as of no significance.

The case shows that the Russell Paper Company, where the patentee, Russell, was employed, and, as maintained on the part of the complainant, as a principal employé so far as concerns this subject-matter of lining digesters, had very serious difficulties with its digesters during the winter, spring, and summer of 1888 and 1889, and that, as already said, boiler No. 5 was lined in the way described as an experiment in October, 1889, and the other boilers later, in the spring of 1890. During the whole of this no representation was made by the patentee of his alleged discovery or invention; but he took a part in the test made with the Wilder boiler and in lining boiler No. 5, remaining absolutely mute so far as any invention or discovery by him was concerned. In Loom Co. v. Higgins, 105 U. S. 580, 593, much reliance is placed on evidence of this character. An attempt is made by the complainant to explain this silence, but it is not satisfactory. On the whole, we are of the opinion that the complainant has failed to prove, by the degree of evidence which, we have pointed out, is required on its behalf, that the patentee had accomplished the invention relied on in this case prior to the knowledge which he derived through Springer's letter of July 30, 1889.

The complainant gives a broader construction to the patentee's claims than we have done. We use, for this, the complainant's own language:

"It consists in an improved pulp digester, in which the metal shell, corrodible by the acid solution employed, is protected against its attacks by a continuous coat or lining of cement of proper thickness applied upon the interior of the shell; the term 'cement' including any material or mixture of materials which resists the acid solution under high heat and pressure, and which is capable of being made plastic and adhesive to the digester shell, and so compact as in practice to prevent the acid solution from reaching the iron shell in consequence of the high steam pressure used in the process."

We have not been inattentive to this proposition, but, for the reasons we have explained, we cannot give the patent so broad a construction. Therefore, we have not undertaken to determine what would be the result of the case if this position of the complainant could be sustained. Let there be a decree dismissing the bill, with costs.