# TYLER *v.* KELCH.

---

PATENTS; INTERFERENCE; EVIDENCE.

1. In an interference proceeding, the party first filing his application for a patent is the senior party, and as such entitled to the benefit of a constructive reduction to practice; and the burden of proof is on the junior applicant to overcome the presumption in favor of his adversary by full and satisfactory proof; especially where the last applicant, knowing of the other's application, waits fourteen months before filing his.

2. Testimony of one of the parties to an interference as to conversations with and declarations of his adversary in regard to the transaction in controversy is inadmissible where the latter died before the testimony was taken.

3. One cannot acquire by purchase from the real inventor the right to an invention so as to receive a patent therefor in his own name, based upon the surrender or concession by the true inventor of his rights; but one, other than the true inventor, can acquire, by contract, an interest in the proceeds of the patent, in consideration of mechanical labor and skill applied in the construction of a machine, or the making of models or drawings upon which practical machines may be constructed.

4. Where, in an interference, the subject-matter of which was a fare-register, it appeared that the junior applicant constructed the first machine embodying the invention and delivered it to the senior applicant when completed, and the proof in behalf of the senior applicant is to the effect that the junior applicant was merely employed by him to construct a machine embodying his idea, and the evidence shows that the senior applicant conceived the invention before the alleged date of his adversary's conception, and the latter, with knowledge of the former's application, waited fourteen months before filing his, it was *held* that the senior applicant was entitled to an award of priority.

No. 179.  Patent Appeals.  Submitted November 13, 1901.  Decided January 7, 1902.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.          *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Richard J. McCarty* for the appellant.

*Mr. H. A. Toulmin* and *Mr. L. S. Bacon* for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This is an appeal in a matter of interference from the Patent Office. The subject-matter of the supposed interference is a fare-register to be used upon cars and other conveyances of passengers. The machine as described in the respective claims for patent is quite complicated; and the issue of interference, as made in the Patent Office, is presented in seven counts; and they are as follows:

" 1. In a fare-register, the combination of groups of fare-registering wheels, each group having its own classification of fares, a rotable fare-indicator to exhibit each class of fares, indicator-wheels to exhibit the number of passengers,

differential plates to concurrently actuate each series of registering-wheels and a fare-indicator, and means for simultaneously actuating said plates and the indicator-wheels.

" 2. In a fare-register, the combination of groups of fare-
registering wheels, each group having its own classification
of fares, a rotable fare-indicator to exhibit the fares of each
class, indicator-wheels to exhibit the number of passengers,
differential plates to concurrently actuate each group of
registering-wheels and a fare-indicator, and an operating-
lever to simultaneously actuate said differential plates and
indicator-wheels.

" 3. In a fare-register, the combination of groups of fare-
registering-wheels, each group registering a separate class
of fares, a rotable fare-indicator for each class of fares, differential plates pivotally connected and operating concurrently to actuate each group of fare-registering wheels and
their respective indicator, and a single member for imparting variable movements to said plates.

" 4. In a fare-register, the combination of groups of fare-
registering wheels, each group adapted to register a distinct
class of fares, a rotable fare-indicator to exhibit the fares
of each specific class of registering-wheels, differential plates
movable concurrently to actuate each group of fare-registering wheels and fare-indicator, an oscillating shaft, means
thereon for locking each fare-indicator in an exposed position, and means for simultaneously imparting variable
movements to said differential plates.

" 5. In a fare-register, the combination of groups of fare-
registering wheels, each group having a specific class of
fares, a fare-indicator movable in a horizontal plane to expose the fares of each group of said registering-wheels, variably-movable plates to concurrently actuate a group of
registering-wheels and a fare-indicator, and means for simultaneously actuating said plates.

" 6. In a fare-register, the combination of fare-registering wheels assembled in groups, a fare-indicator to exhibit
the fares of each group, the said fare-indicator having a
blank space and a space upon which the fare is inscribed
which are adapted to be exposed alternately, an oscillating

shaft, means thereon for simultaneously locking one fare-indicator in an exposed position and for releasing another to expose the blank space thereon, pivotally-connected plates imparting variable movements which actuate a group of fare-registering wheels and a fare-indicator, and means for imparting such variable movements to said plates.

" 7. In a fare-register, the combination with groups of fare-registering wheels, of a platen having two perpendicular sides with openings therein, cams movable in said openings to elevate said platen, and means for locking the cam-shaft against movement."

According to the record Wallace M. Kelch, the senior party, filed his application on April 1, 1898, which was allowed to become forfeited by nonpayment of fees; but the same was renewed February 17, 1899. On May 17, 1899, Hiram Tyler, the junior party, filed his application, it being nearly fourteen months after the original application of Kelch was filed. It is further shown by the record that Kelch made an assignment of his entire interest in the invention described, to Wilfred I. Ohmer, and that after making such assignment he died, July 13, 1899, and that his assignee is now conducting this interference. Tyler, the junior party, also assigned his claim to the invention in question to John F. Ohmer; and both assignments were made before the declaration of interference, and the contest of the interference is, therefore, in reality between the respective assignees.

The preliminary statement on the part of Wilfred I. Ohmer, the assignee of Kelch, was made by Mrs. Kelch, the administratrix of her deceased husband, and in that statement she alleges under oath, that she is the widow and the administratrix of Kelch, the party who filed the claim and made application for a patent thereon. She alleges upon information and belief that the invention in issue was conceived by Kelch in April, 1897, and was disclosed to others in April or May, 1897; that he made sketches which he showed to others in September, 1897; that with the assistance of a mechanic, Kelch made a model of his invention between December, 1897, and May, 1898; and that,

during the latter period, Kelch reconstructed the model himself. That during October and November, 1898, Kelch made partial working drawings, and between November, 1898, and March, 1899, he made a commercial machine embodying the invention in issue in this interference.

In the preliminary statement filed by Tyler, he alleges conception of the invention in issue, and the making of drawings of it, in October, 1897, and he alleges disclosure to others in January, 1898, and also the embodiment of the invention in a full-sized working machine in February or March, 1898.

The real question is, as developed in the evidence, not which of two independent inventors of the device in question has priority, but which one of two individual claimants was the real inventor of the device described in the issues. Both parties are conceded to have furnished some evidence tending to show connection with the invention, but which of them was the real original inventor of the device, is the question.

There was a considerable volume of testimony taken, and the testimony produced by the respective parties is not in all respects free from conflict. The evidence has been very carefully examined and compared by all three of the tribunals of the Patent Office. First, by the examiner of interferences, then by the board of examiners-in-chief, consisting of two members; and, lastly, by the Commissioner of Patents. The Commissioner, on appeal to him, and from whose judgment this appeal is taken, concurred with the ruling of the examiner of interferences, and reversed the ruling of the board of examiners-in-chief, and awarded priority to Kelch as the real inventor. Was he right in that conclusion ?

We have very carefully read and considered the evidence contained in the record; and we have also carefully considered the several reviews of that evidence as contained in the opinions delivered by the different tribunals in the Patent Office; and with the convictions produced in our minds, we shall not undertake to go over the evidence in detail, and thus repeat it for the fourth time. The question pre-

sented is mainly one of fact only; and in such case, where it is apparent that the facts have all been fully and fairly treated by the tribunals below, and the question is as to which or what conclusion is proper, there is no practical good resulting from a restatement of evidence. We shall content ourselves, therefore, in stating the general conclusions resulting from the evidence, and which to us seem to be quite controlling in the disposition of the case.

In the first place, it must be observed and borne in mind, that Kelch was the party who first made application for a patent, thereby becoming senior party, and as such entitled to the benefit of a constructive reduction to practice, and, by that means, making a *prima facie* case as against Tyler, the subsequent applicant. Such being the position of the parties upon the record, the *onus* of proof was assumed by Tyler, who did not file his application until nearly fourteen months after that of Kelch had been filed, though he was, according to his own admission, all the time fully aware of the fact of the claim made by Kelch, and that application had been made by the latter for a patent thereon. This condition of the record requires full and satisfactory proof on the part of Tyler to overcome the presumption in favor of Kelch.

To meet and discharge this *onus* of proof, Tyler, testifying in his own behalf, states that he conceived the invention in October, 1897; that he disclosed the conception to others about the middle of October and at several times thereafter, and among those to whom the disclosure was made was Kelch. That about October 15, 1897, he made drawings of his invention, two of which are shown in evidence as Exhibits A and B. He also states that he made other drawings which were turned over to Kelch: that in January, 1898, he showed Kelch the two exhibit drawings and gave him blue-prints of them. Two parts of a model are shown as Exhibits O and D. He also states that, during February and March, 1898, he made a full-sized working machine, and turned it over to Kelch: that this was done about the last of March or the first of April, 1898. That he has

never demanded its return, nor has it in fact been returned. He says that he delayed applying for a patent of the invention for the reason that it was not as perfect as he would like to have had it, and for the further reason that he was dissatisfied with his position with the John F. Ohmer Register Company, and he deemed it expedient to hold off until he was perfectly sure of his position with them.

As explanatory of his relations with John F. Ohmer, the present assignee of the claim, and his relations with Kelch, and the reason for placing his invention in the possession of the latter to enable him to apply for a patent therefor, Tyler, testifying after the death of Kelch, states as follows:

"Mr. Kelch came to my house some time during the month of January, 1898, and asked me to go in with him on an invention of some kind, so that we could make some money. We talked over various things, and decided on nothing. I told him that I already had a fare-register invented, and that I had the drawings made. He asked to see it, and I showed it to him. He was very much pleased with it, and he asked me if there was not some way that he could go in with me. I told him that there was not any way that he could assist me in inventing the register, because it was all completed, and that I had an agreement with Mr. Ohmer that all inventions pertaining to street-car fare-registers was to be assigned to him, and I could not go in with him as joint inventor, and neither could I take out an invention on the register myself without assigning it to Mr. Ohmer, and that would not benefit him at all. He then asked me to let him have the register, and he would make an improvement as a joint inventor, and would take out a patent. I told him that I could not do that; so then he asked me to let him have the blue-prints, and take out a patent in his own name. I explained to him that it would not be legal, that he was not the inventor of the machine; and he did not seem to think that it amounted to very much, so I agreed to let him have the blue-prints and what of models I had, or part of the models. I gave him the blue-prints and part of the models. He afterwards made an application."

So far as this statement of Tyler embraced the conversation with and declarations of Kelch in regard to the alleged transaction between them, and now in controversy, it was objected to as being inadmissible, Kelch having died before the testimony was taken. The objection was certainly well taken; though it does not in any manner affect the result, whether the conversations and declarations of Kelch be considered in or out of the case.

Tyler further stated in his testimony, that there was an understanding between himself and Kelch " that he (Kelch), if he secured a patent on the invention, was to offer it for sale to John F. Ohmer; that Kelch seemed to think that it did not make ' very much difference who signed the papers, just so they were signed;' that a money consideration of $75 passed between them; that Kelch was by the arrangement between them supposed to have the right to make sale to Ohmer, and that he, Tyler, was not to share any of the proceeds of the sale."

In this connection there was brought out, on cross-examination of Tyler, the fact that he had executed, after the application made by Kelch, the following receipt or release to the latter, for money paid to Tyler for some claim or interest in respect of the fare-register:

" In consideration of the sum of one dollar to me in hand paid, the receipt of which I hereby acknowledge, I do hereby release and surrender to Wallace M. Kelch, all interest or claim I may have in the fare-register upon which application for patent has been made by said William M. Kelch, April 1, 1898, Serial No. 676,078.

" Signed at Dayton, Ohio, this 27th day of June, 1898.

    "(Signed)                    HIRAM TYLER."

In determining what interest or claim is referred to in this release, we are virtually required to determine the real nature and subject-matter of the contest between the parties. It is contended by Tyler that the interest and claim referred to in this release was and is his interest and claim

in the invention in issue, as sole original inventor of the fare-register mentioned. The release, however, does not so declare. If it were true, as he contends, that he was and is the sole original inventor of the device in issue, then it would be very clear, there could be no valid claim by Kelch, and the claim made by him, or by his representative, would constitute no foundation upon which a patent could issue in his name as the real inventor, when in fact he was not such, though he had bought and paid for the surrender or concession by the real and true inventor. The patent must disclose the real inventor, and the issue thereof must be founded upon his right as such inventor, and not upon the claim of some other person. But it does not follow that some other person than the true inventor may not have, by contract, an interest in the proceeds of the patent, in consideration of mechanical labor and skill applied in the construction of a machine, or the making of models or drawings upon which practical machines may be constructed. Such interest in the patent may be acquired by contract, but the interest so acquired is not the right or interest of an inventor upon which a patent can be obtained. *Collar Co. v. Van Dusen,* 23 Wall. 530, 563–4; *Blakeny v. Goode,* 30 Ohio St. 350. And such would appear to have been the nature of the interest or claim of Tyler in the invention of the fare-register referred to in the release, as shown by the circumstances of the case. The invention was one of considerable complexity, requiring more than ordinary inventive genius to be successful in the work, and, if successful in operation, must be of great value. Such an invention would hardly have been disposed of by the sole original inventor for the small sum of $75, after he had reduced the invention to practice, and made a full-sized working machine for its operation. To suppose such a transaction to have occurred between Tyler and Kelch, both of whom are shown to have been inventors, would be to indulge a supposition contrary to all rational conduct of men understanding the nature of the business in which they were engaged. Assuming the parties to have been honest in the transaction,

it is difficult to conclude that the interest or claim referred
to in this release could have been the interest and claim, of
the sole original inventor of the fare-register, as Tyler now
claims it to have been. Such claim, however, would seem to
be wholly incongruous with the real facts of the case.'

Tyler, however, would have us believe that the transaction
referred to in the release was a mere sham, adopted for the
purpose of deceiving and misleading John F. Ohmer, to
whom he was under contract obligations in regard to inven-
tions that he might make of the character in question. In
other words, that he entered into the transaction with Kelch
collusively, in order to avoid applying for a patent in his own
name, as the real inventor, because, if he did so apply,
John F. Ohmer would at once assert his right to the
invention under the prior contract, and that he, Tyler, would
realize nothing from the invention. This story is not
credible. If he was the real inventor, as he now claims to be,
why was he willing to *release and surrender* all his interest
and claim in the invention for the small sum of $75, under
what he describes to be the collusive sale to Kelch? He
says, in his testimony, that he was not to share in any
of the proceeds of sale. It may be very true, that, after he
received the $75, and executed the release, all claim that he
may have had in the profits of the patent for the mechanical
skill and labor applied in the making a model of the inven-
tion, may have been, and was no doubt, satisfied and extin-
guished. But the attempt to support the claim to the in-
vention by the testimony given by himself, carries with it
a strong impeachment of the whole story told by him, and
no part of it can be accepted as reliable, except where it
may be found to be corroborated by independent evidence.
And the evidence produced by him to corroborate his state-
ment, and to sustain his claim to the invention in issue, is
far from satisfactory, when compared with the evidence in
support of the claim of Kelch.

It is an undisputed fact that Tyler constructed and had
in his possession a machine or model, the first physical em-
bodiment of the invention. This machine was delivered over

to Kelch, and after some changes or modifications therein made by Kelch himself, it was made the subject of the application filed by Kelch on April 1, 1898. It is contended on the part of the representative of Kelch that this construction of the model or machine by Tyler was not the execution and working out of his own conception or invention, but that Tyler was simply a mechanic employed by Kelch to construct the model for him, in accordance with the invention which he, Kelch, had originated and explained to Tyler.

The evidence is quite conclusive of the fact that Kelch conceived the invention in April or May, 1897, nearly six months before it is claimed or pretended that there was any conception of the invention by Tyler; that the disclosure of the invention was made by Kelch immediately or shortly after the conception by him, to several persons. He disclosed the invention to Thomas Carney in May, 1897; to Morris Pursell some time between May and December, 1897; and that he borrowed drawing instruments of Joseph M. Kelley, in December, 1897, and made drawings of the invention at that time. The testimony of all these witnesses is very explicit, especially that of Thomas Carney; and there is no attempt to impeach or question their veracity or good faith. Then it is shown by the testimony of Pursell and of Mrs. Kelch, the widow, that Tyler was employed by Kelch as a mechanic to construct the model of the invention, and that they supplied money to Kelch to pay Tyler while he was at work on the machine. Pursell also states that he furnished to Kelch the brass type to be used in the construction of the model, and Tyler admits that such type were received and used by him in the construction of the machine. These two witnesses had the fullest opportunity of knowing what was going on as between Kelch and Tyler, and the testimony of Mrs. Kelch is positive and direct to the fact. The Commissioner has well said, that there is nothing in Tyler's testimony, nor in his whole record, which is incompatible with the evidence adduced on behalf of Kelch, to show that Tyler was in Kelch's employment in constructing this model, save and except only the statement of Tyler that

the invention was of his own conception or origination; and this statement of Tyler the Commissioner did not accept as reliable.

In regard to the release from Tyler to Kelch, to which we have referred, the Commissioner laid no special stress upon it, in arriving at his conclusion. He says, what is very true, that Tyler puts conflicting interpretations upon it. But whatever interpretation is given to it, according to the opinion of the Commissioner, it comes at too late a date and does not tend to any conclusion which would overthrow the testimony which shows Kelch to have conceived and disclosed the invention in May, 1897, at the latest, and to have hired Tyler to construct a model in January, 1898. Whatever effect, says the Commissioner, may be attributed to this paper is more than balanced by Tyler's long delay in making his application — approximately fourteen months after the Kelch application — and his silence during that time when he knew that Kelch's application was pending before the Office; and further, says the Commissioner, " this release is not incompatible with the theory of Kelch's position as the employer of Tyler."

The Commissioner agreeing with the examiner of interferences, but disagreeing with the conclusion of the examiners-in-chief in holding Tyler to be entitled to priority, reversed the latter ruling, and awarded priority of invention to Kelch; and in that conclusion and judgment we entirely concur.

We therefore affirm the ruling and judgment of the Commissioner of Patents, and direct a copy of the record and of this opinion to be transmitted to the Commissioner of Patents to be recorded, etc. *Judgment of Commissioner affirmed.*