**The S. O. S. COMPANY, Plaintiff,**

v.

**TRIANGLE MANUFACTURING COMPANY, Defendant.**

**Civ. A. No. 54C959.**

United States District Court
N. D. Illinois, E. D.
June 17, 1957.

Sidley, Austin, Burgess & Smith, Loftus, Lucas & Hammand, Chicago, Ill., for plaintiff.

Olson, Mecklenburger, von Holst, Pendleton & Neuman, Chicago, Ill., for defendant.

PERRY, District Judge.

This case came on to be heard before the Court on the pleadings and the evidence consisting of oral testimony, documentary proofs, and physical exhibits. Witnesses were called in open court by the parties, and some portions of the testimony have been in the form of depositions. The Court has had the benefit of briefs of counsel and of oral arguments. The Court has reviewed the record and the briefs of counsel, weighed carefully the arguments presented, and considered the authorities advanced by counsel in support of their respective positions.

Upon a consideration of the whole case, the Court makes the following:

### Findings of Fact

1. Plaintiff, The S. O. S. Company, is a corporation organized and existing under the laws of the state of Delaware, and has its principal place of business at Chicago, Illinois. Defendant, Triangle Manufacturing Company, is an Illinois corporation and has its principal place of business at Chicago, Illinois.

2. This is an action for damages and an injunction against defendant for alleged infringement of U.S. Patent No. 2,601,771, issued July 1, 1952, of which plaintiff is the owner, on an application of John A. Cameron, filed March 28, 1951.

3. The Cameron patent in suit is entitled "Cleaning Aid." It discloses a device or implement which may be described as nothing more than an open-mesh pad of generally circular shape knitted of a ribbon-like plastic filament instead of the conventional ribbon-like metallic filament. Such a pad, according to the only embodiment shown and described in the patent, is manipulatively formed by (a) turning inside-out a tubular sleeve which has been conventionally knitted; (b) dividing the sleeve into three equal sections by means of two tie strings; and (c) then tucking the end sections back into and under the main or central section. The only plastic composition disclosed in the patent is one technically known as a copolymer of vinylidene chloride and vinyl chloride, and commonly or generically known in the trade as "saran." Hereinafter for convenience this plastic composition will be referred to by its generic name.

4. Claims 2 and 4 of the Cameron patent have been placed in suit. They differ only in that claim 2 specifies that the cleaning aid is made from a ribbon-like strand of plastic, whereas claim 4 is specific to the only disclosed embodiment of the patent and recites that the cleaning aid is made from a saran strand having a prescribed cross-sectional area. For convenience and to facilitate reading, claim 4 may be separated into its respective elements in the form adopted by plaintiff and its patent expert, as follows:

Claim 4.

1. A hand-compressible, self-restoring, non-matting cleaning aid comprising

2. an open mesh pad consisting of

3. spaced but slidably connected ribbon-like strands,

4. each comprising a mixture of copolymers of vinylidene chloride and vinyl chloride,

5. said strands having a cross sectional area substantially equal to the area of a circle having a diameter of .015 to .020 inch and

6. having a generally serpentine shape affording relatively stiff spring loops of substantially equal length and width,

7. with alternate semicircular curved end portions of the spring loops of adjoining strands loosely interlocked with one another to afford relatively wide sliding action of interlocked loops against one another to effect a self-cleansing action of the pad by dislodging foreign substances in the interstices between the individual spring loops of the strands to facilitate flushing said substances from said pads and to prevent matting;

8. the end portions of the spring loops of said strands being disposed in edgewise position with respect to the outer surface of the pad, whereby the edges of said strands may bear directly against surface to which the pad is applied.

5. Defendant's accused structures are exemplified by Plaintiff's Exhibits 3, 4, and 45A. The filament of Plaintiff's Exhibit 3 is a saran filament. The filament of Plaintiff's Exhibits 4 and 45A is a copolymer of styrene and acrylonitrile.

6. Cleaning aids of the type disclosed in the Cameron patent in suit are old and well known, as shown by the prior patent art. Thus:

(a) Kingman patent No. 1,482,016, issued in 1924, illustrates and describes a scouring device knitted of a metallic material, preferably in the form of flat and narrow ribbon-like strands and then shaped to produce an elastic spongiform mass. This device has bulk and was designed to be gripped and held in the hand. It was resilient or elastic, and Kingman particularly emphasized the capacity of his device "when pressed against a surface * * * (to) conform thereto and effectively contact with the surface, as for instance when pressing the scouring device into the corners or angles of a pot, kettle or pan." Kingman also recognized that by virtue of the porous or spongiform character of the mass constituting his device, it was consequently interspersed with interstices which permitted the device to be cleaned after use and maintained in a sanitary condition through the simple expedient of flowing water through the interstices.

(d) Goodloe patent No. 2,427,274, issued in 1947, discloses a ball-like "self-form retaining" pad formed from a knitted metallic sleeve and designed to be compressed in the hand. It was expressly described as a "compact and easily handled device" furnishing a "self-retained resilent body mass." As illustrated in Fig. 6, the knot formed in the

tubular sleeve closes the center of the body portion, thus providing substantial body or mass in the device. Goodloe's pad was non-matting and not easily crimped or deformed. The substantial body of the pad served effectively to maintain a condition which did not lend itself to permanent deformation of the knitted loops. Goodloe's pad was also emphasized as being "adequately resilient or compressible to assure conformance of an applied area thereof to a surface over which it is moved for abrasive cleaning or scouring effect." Goodloe fully appreciated the fact that the inside surface of a tubular knit metallic mesh fabric is of rougher and therefore of better abrasive character than is the outside surface, due to the fact that the bights of the knit loops project from the inside surface. He therefore expressly taught taking advantage of this condition by rolling the tubular fabric upon itself, so that the rougher and therefore abrasive inner surface became the outwardly presented and operative surface of the completed pad.

(c) Steiner patent No. 2,500,715, issued in 1950, discloses a scouring pad formed from a knitted metallic fabric sleeve and designed to be easily grasped and squeezed in the hand for use in cleaning pots and pans in the kitchen of the home. It is made of an open-mesh metallic strand material arranged as a flexible mass of somewhat beehive shape. Steiner's pad was formed by rolling the knitted sleeve upon itself from both ends, then twisting the remaining sleeve, and then tucking one roll into the other, as illustrated in Fig. 9 of the patent. Steiner also emphasized that mass was imparted to his pad by virtue of the manner in which it was formed, and further pointed out that this mass was resilient, thus enabling the user to squeeze the pad and reduce it in volume by hand pressure to make it conform with such surfaces as require cleaning in a pot or pan. The pad disclosed in the Steiner patent was thus a compact, hand-compressible, self-restoring, and non-matting cleaning aid. The alleged novelty of that patent resided in the use of a rubber band in a manner which closed the pad and yet provided an elastic mouth to facilitate washing thereof.

7. The Kingman, Goodloe, and Steiner patents, as well as the patent to Field No. 1,682,117, issued in 1928, disclose knitted loop structures consisting of plain loops interlocked by the knitting process in the usual manner. In these patents the loops of a given course extending in one direction engage the loops of adjoining courses, and being thus interlocked, such loops actually slide in relation to each other. The loops shown in these knitted structures were of serpentine shape and provided a balanced loop formation. It was an inherent function of loop structures of this character that the interlocked loops actually move against each other and inevitably scrape one against the other. In fact, the Field patent taught that the balanced loop formation of the knitted mesh was "self-cleansing or at least * * * readily cleansed because of the freedom with which the water may be circulated."

8. Prior to the advent of Cameron, one of the principal cleaning aids or scouring devices which was on sale and in use in this country was the steel wool impregnated pad, such as that made and sold by the plaintiff under its trademark "S.O.S." and the so-called "Brillo" pad. This type of pad is exemplified by Defendant's Exhibit 19. Also extensively sold were knitted open-mesh metallic pads or copper pot cleaners, such as the "Chore Girl" pad, Plaintiff's Exhibit 75A, and a pad sold under the trademark "Handy Mandy" by defendant and its predecessor in business, Gail Manufacturing Company, such a pad being exemplified by Defendant's Exhibits 167 and 169. The "Chore Girl" pad does not appear to have been formed or assembled like any of the prior patents which have been introduced in evidence. On the other hand, the metallic "Handy Mandy" pads were, prior to the development shown in the Steiner patent, knitted and manipulatively formed in a manner resembling the method taught in the prior

Goodloe patent. Defendant's Exhibit 169 is the pad illustrated and described in Steiner patent No. 2,500,715. The prior commercial "Handy Mandy" pads were hand-compressible and self-restoring devices. As formed, they were resilient, which enabled them when pressed against a surface to conform thereto. They were substantially non-matting and not easily crimped or deformed.

9. Plaintiff has conceded that the accused plastic pads Plaintiff's Exhibits 3, 4, and 45A have the same "twisted interior portion and utilize the rubber band closure method" shown in the Steiner patent No. 2,500,715, and defendant's expert has established that structurewise the exterior of defendant's accused pads is the same as the exterior of the Steiner and Goodloe patents. The only difference between defendant's accused pads and the pad made and sold by defendant and its predecessor prior to the effective date of the Cameron patent is found in the filament material. If the accused pads are more hand-compressible, more self-restoring, or more nonmatting than defendant's prior metallic pads, these properties are due entirely to the nature and characteristics of the substituted material and nothing else, and in any event, the differences are in degree only.

10. Prior to any work done by Cameron, the properties and characteristics of saran were well known. Such publications as "Vinylidene Chloride Polymers"—American Chemical Society (March 18, 1942); "Vinylidene Chloride Polymers"—Industrial and Engineering Chemistry (April, 1943); and Chemical Engineering News, Vol. 18, No. 21, p. 924 (1940), fully described and explained the properties and characteristics of saran, and pointed out the many uses and applications of which the material was capable. Saran monofilaments were especially known to have exceptional properties, such as high tensile strength, great flexibility, long fatigue life, and good elasticity. It was also particularly known that such a monofilament was chemically resistant, not seriously af-

fected by temperatures above that of boiling water, was abrasion resistant, cleaned easily, and was available in a large range of attractive colors. In fact, plaintiff has admitted in its brief that the above-identified prior art publications show that saran was known to possess, among numerous other properties, the particular characteristics which Cameron enumerates in his patent as essential for use in his cleaning aid. Plaintiff states that it does not deny that these properties and characteristics of saran were known prior to Cameron's alleged invention.

11. Plaintiff contends that Cameron was the first to recognize that the well-known properties and characteristics of saran made this material suitable for use in a knitted kitchen cleaning aid and that by virtue thereof Cameron is shown to have exercised invention. The Court is unable to agree with this contention because the evidence shows that the properties and characteristics of saran were so well known that the use of saran suggested itself as soon as the need for a copper wire replacement arose.

(a) Early in the year 1950 Cameron's employer, Cleanser Products, Inc., one of the original plaintiffs in this action, was engaged in the manufacture and sale of steel wool impregnated pads. Desiring to enter the knitted metallic pad cleaner business, Cleanser Products began to purchase such items for resale from defendant and others. It then decided to engage itself in the manufacture of copper pot cleaners instead of purchasing them from others, and a knitting machine for this purpose was ordered. In the meantime, the Korean War had commenced, and while copper did not become the critical material which it became during World War II, there was nevertheless a threatened shortage.

(b) Cameron testified that originally he conceived of producing a cleaning pad from a plastic filament. However, Cameron knew nothing whatsoever about plastics and he admitted that his

original idea did not embrace any particular plastic. Cameron also admitted that in discussing his idea with plastic men, one William Levis of the Sunlite Manufacturing Company, of Milwaukee, Wisconsin, suggested the use of saran as the material best suited for pot cleaner purposes. So far as the Court can determine, this occurred in or about September, 1950. There is no corroboration of Cameron's testimony that his conception had occurred prior to the year 1950. There is no contemporary record on which the Court could base a finding that Cameron's conception occurred earlier than September or October, 1950.

(c) In October, 1950, Cameron inquired of the Firestone Plastics Company concerning the availability of a saran monofilament to be "used in knitting a small cloth for cleaning and scouring purposes" and asked for a rectangular-shaped strand but pointed out that a round filament approximately .008″ to .004″ would be acceptable if it could be reworked to a rectangular cross-sectional shape. The sizes specified by Cameron in these letters were substantially those of the ribbon-like copper wire then employed in the knitted copper cleaning aids with which Cameron was already familiar.

(d) Firestone advised Cameron that it did not make filament in rectangular shape, and supplied samples in various sizes. After examining the samples, Cameron selected the .020 and .030 diameters and obtained small quantities of these sizes. Thereafter Firestone further developed a suitable filament for Cameron's knitting machine.

(e) Cameron cannot claim credit for originating either a flat or ribbon-like saran filament. These were old and well known prior to 1950. The filament which plaintiff claims was made especially for it by Firestone Plastics Company is disclosed in that Company's Stedman patent No. 2,354,435, dated July 25, 1944, and plaintiff's expert admitted that a ribbon-like saran filament of a cross section equal to a circle having a .015 to .020″ diameter was old, well known, and available prior to Cameron's work.

12. Prior to the advent of Cameron there was no persistent demand and long recognized need for a pad such as that proposed by Cameron. It is true that during World War II many substitutes appeared as replacements for the steel wool pads and metallic pot cleaners, but as soon as wartime restrictions on copper and steel were lifted, the art returned to these same devices employing the old materials. As of 1951, when Cameron filed his patent application, these prior devices were again being extensively used, and there is no evidence of any dissatisfaction with them. There is no evidence of any problem prior to 1950. There is no evidence that anyone had ever tried unsuccessfully to knit a plastic filament into a fabric to be used for pot cleaner purposes. And there is no proof of fruitless demands and efforts to provide a cleaning aid which would be self-restoring and non-matting. Plaintiff, in order to establish a problem, has contended that Mr. Max Steiner, president of defendant, admitted that he had been experimenting with plastics ever since World War II. However, there is no evidence as to what Mr. Steiner was working on or with. Moreover, since, as plaintiff contends, the alleged invention here depends upon the mere recognition of the suitability of a saran filament for use in a knitted cleaning aid, it necessarily follows that there was no problem baffling contemporary workers, and indeed, it is implicit in plaintiff's admission that, contrary to plaintiff's assertions, there was no problem.

13. Plaintiff also relies upon alleged commercial success of the cleaning aid of the Cameron patent in suit as being evidence of invention. It is true that extensive sales have been made by plaintiff of plastic cleaning pads, but the Court is not convinced that such sales were due to the merits of Cameron's alleged invention. The evidence shows that tremendous sums have been

expended by plaintiff in advertising its plastic cleaning pad, this expenditure ranging from 6% to 19% of gross sales. These are exorbitant and disproportionate advertising costs, indicating that acceptance and extensive sales have not genuinely been due to the merits of the alleged invention. Moreover, the two cleaning pads or aids upon which Cameron avowedly sought to improve, namely, the steel wool pad and the knitted metallic copper mesh pad, are still extensively sold and used and have not been displaced or replaced by the device of the patent in suit.

14. The Cameron patent in suit discloses nothing more or less than the substitution of one material for another. The purpose, shape, structure, and mode of use of the device of the Cameron patent in suit are for all practical purposes the same as the prior devices, the sole difference over the prior art residing in the substituted material. If the device of the Cameron patent in suit may be considered superior to the prior art devices and teachings, this superiority or excellence is one of degree only and is due entirely to the properties and characteristics of the particular substituted material which plaintiff has admitted, as before pointed out, were old and well known. Thus no exceptional imaginative talent was exhibited in merely recognizing the suitability for use of a ribbon-like plastic filament in place of a ribbon-like metallic filament. The alleged new properties and alleged wider range of uses of the plastic pad were not unexpected or surprising, but were the foreseeable consequences of the selection of the particular plastic mentioned in the patent. The so-called gentleness of Cameron's plastic pad upon which plaintiff strongly relies was asserted in the patent to be in addition to or complementary of the alleged aggressiveness of the Cameron pad, namely, an ability to clean and polish blackened or burned surfaces on cooking utensils. In other words, Cameron claimed to have reconciled mutually antagonistic qualities or requirements. The proofs, however, now show that he did not do so.

Cameron's pad cannot clean and polish blackened or burned surfaces to the high degree asserted in the patent. Invention, therefore, cannot be predicated upon the assertion that Cameron's pad is "a better pad" when, as a matter of fact, this means only gentleness and amounts to an acknowledgment that the Cameron cleaning pad fails to achieve the very first "must" of the patent in suit.

15. The conception and production of the device of the Cameron patent in suit did not involve the exercise of invention, but rather involved mere mechanical skill.

16. The cleaning pad of the Cameron patent in suit was, moreover, old, as shown by the February, 1943, issue of *Chain Store Age*. This publication contains a disclosure of an improved plastic scouring pad. The pad illustrated is ball-like in shape and obviously of the open-mesh type. It is described as having the same "mesh construction as former metal type of pot cleaners." Plaintiff's expert witness admitted that this publication disclosed a pad which is open mesh, knitted like the old metal type that he was familiar with, and that the pad illustrated and described was generally of the same character as the "Handy Mandy" knitted copper pad which had been made and sold by defendant and its predecessor as early as 1932. Although the publication does not indicate the particular plastic material of the knitted strands or their size or cross section, plaintiff's expert nevertheless admitted that the strands of the publication were plastic strands and were interlocked and slidably connected as in the metal type. However, in view of plaintiff's expert's further admission that elements 3, 4, and 5 of Cameron's claim 4 were old and well known and disclosed in the prior art publications dealing with saran, it must be concluded that the *Chain Store Age* publication teaches and discloses the alleged contribution of Cameron. Even if it were true that the publication did not constitute an anticipation, nevertheless the conception and production of the Cameron cleaning pad did not, in view of

the *Chain Store* publication and the prior knowledge concerning saran, involve the exercise of invention, but rather involved mere mechanical skill.

17. The file wrapper of the patent in suit indicates that the Patent Office Examiner was of the opinion that structurewise the Cameron pad was new and unique. Cameron, in securing the final allowance of his claims, argued that the strands of his pad were of a "unique serpentine configuration" and that the prior art did not disclose either a structure having "alternate semicircular curved end portions loosely interlocked with each other" or a structure by which "a wide sliding action between interlocked loops" was achieved. These structural and operational features were old in such patents as Kingman patent No. 1,482,-016, Goodloe patent No. 2,427,274, Steiner patent No. 2,500,715, and Field patent No. 1,682,117, none of which was found and considered by the Examiner. Neither did the Examiner have before him the publications regarding saran which plaintiff now admits teach or publish all of the characteristics which Cameron enumerates in his patent as essential for use in his cleaning aid, nor the February, 1943, *Chain Store Age* publication. Any presumption that the Patent Office had before it the most pertinent prior art is vitiated.

18. Contrary to the defendant's contention, the efforts of Max S. Steiner in the use of a saran filament were very elementary. His work became advanced only after the Cameron disclosure to him.

19. The evidence revealed that Count 1 was brought in good faith and that the plaintiffs acted as reasonable and prudent persons in so doing.

### Conclusions of Law

1. The Court has jurisdiction of the parties and of the cause of action alleged in Count I of the complaint.

■ 2. Claims 2 and 4, and each of them, of the Cameron patent in suit when construed to include the defendant's accused pads, are invalid as claiming and covering no more than an unpatentable substitution of material.

■ 3. Where the patented article, by virtue of a substituted material, differs from the old article in degree of excellence only, where it merely accentuates, or achieves to a greater degree, desirable qualities possessed to a less degree by the old article, and where the alleged new properties or wider range of uses claimed for the patented article were not unexpected or surprising in view of the known properties or characteristics of the substituted material, patentable invention cannot exist. Hotchkiss v. Greenwood, 11 How. 248, 52 U.S. 248, 13 L.Ed. 683; Electro Mfg. Co. v. Yellin, 7 Cir., 132 F.2d 979; Associated Plastics Companies v. Gits Molding Co., 7 Cir., 182 F.2d 1000; Otis v. National Tea Company, 7 Cir., 218 F.2d 153.

■ 4. Claims 2 and 4, and each of them, of the Cameron patent in suit are invalid as lacking patentable invention in view of prior patents, publications, and commercial devices. The prior art here is such that a person skilled in the art might readily produce the improvement which Cameron claimed to have made. It therefore was obvious and involved only an exercise of mechanical skill. Dixie-Vortex Co. v. Paper Container Mfg. Co., 7 Cir., 130 F.2d 569, 572; National Pressure Cooker Co. v. Aluminum Goods Mfg. Co., 7 Cir., 162 F.2d 26, 29; Pleatmaster, Inc. v. J. L. Golding Mfg. Co., 7 Cir., 240 F.2d 894.

■ 5. Claims 2 and 4, and each of them, of the Cameron patent in suit are anticipated by the February, 1943, issue of *Chain Store Age*. It is immaterial that the disclosure of this publication does not specifically include the detail of the plastic strand. Those details were admittedly well known. The question here is whether the alleged improvement of Cameron is taught by the prior art. Richmond Screw Anchor Co. v. Umbach, 7 Cir., 173 F.2d 521, 524; General Time Corp. v. Hansen Mfg. Co., 7 Cir., 199 F.2d 259, 264; Smith v. Dravo Corp., 7 Cir., 203 F.2d 369, 380.

6. Claims 2 and 4, and each of them, of the Cameron patent in suit are invalid in view of the patentee's admission that another person first recognized and suggested to him the use of a saran filament as being suitable for pot cleaner purposes. Collar Company v. Van Dusen, 23 Wall. 530, 90 U.S. 530, 562, 23 L.Ed. 128.

7. Defendant is entitled to a judgment dismissing Count I of the complaint but is not entitled to an award for attorneys' fees or costs.